## STATE v. LEN WALTON.

(Filed 22 October, 1924.)

**1. Criminal Law—Admissions—Evidence—Appeal and Error.**

Where, after the prisoner had been delivered to the sheriff on extradition papers, the sheriff has testified that the prisoner, charged with murder, had made a voluntary admission of a circumstance tending to prove his guilt, without threats or offer of reward, etc., it is not error for the trial judge to exclude a question asked by prisoner's attorney, if the officers at the place of extradition had not previously, before the arrival of the witness, used threats that had induced the prisoner to make the confession.

**2. Homicide—Murder—Evidence—Questions for Jury—Trials.**

Circumstantial evidence in this case tending to show that the prisoner had a grievance against the deceased, had waited at a cross-road for him, and during that time the deceased had met his death from gunshot wounds, etc., *is held* sufficient to sustain a verdict of murder in the first degree.

APPEAL by defendant from *Cranmer, J.,* and a jury, at April Term, 1924, of HOKE.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*Smith & McQueen and Currie & Leach for defendant.*

CLARKSON, J. At August Term, 1923, of Hoke County, before Sinclair, J., Will Walton, Floyd Walton, and Jule Bethea were convicted on an indictment charging Len Walton, Cyrus McLean, and Will McLean, *alias* Will Shaw, with the murder of Dewey Castleberry. The second count charged Floyd Walton, Will Walton, and Jule Bethea, *alias* Jule Easterling, with being accessories before the fact of such murder; and the third count charged Floyd Walton, Will Walton, and Jule Bethea with being accessories after the fact of said murder. Len Walton and Cyrus McLean were fugitives from justice and therefore not on trial. Will McLean, *alias* Will Shaw, was acquitted by the jury. Floyd Walton, Will Walton, and Jule Bethea were convicted upon a general verdict of guilty upon the other two counts, and from the judgment upon such conviction the two Waltons and Jule Bethea appealed to the Supreme Court.

The late lamented *Clark, C. J.,* writing the unanimous opinion of the Court, found no error. *S. v. Walton,* 186 N. C., p. 485.

The defendant Len Walton was a fugitive from justice and was captured in Buffalo, N. Y. Extradition papers from the Governor of North Carolina on the Governor of New York were duly honored, and the defendant was brought back to North Carolina by Edgar Hall, sheriff of Hoke County, who went after the prisoner. The defendant was tried at April Term, 1924, of Hoke County Superior Court upon the bill charging him with murder in the first degree, and upon which charge he was found guilty, and was sentenced by the court to be electrocuted, and appealed to the Supreme Court.

Dewey Castleberry, the deceased, was found desperately wounded near a cross-roads about five miles from Red Springs, in Hoke County, on Sunday morning, 15 July, 1923. Later in the afternoon of the previous day the deceased had some difficulty, while driving his Ford car along the road, with Floyd Walton, a brother of the defendant Len Walton. Floyd Walton was driving a Chalmers car, the property of Mr. Henry McNeill, at the time of the difficulty. It does not appear what was the cause of this difficulty, but it seems that the deceased, Castleberry, fired a pistol at Floyd and wounded him in one of his arms. The State's evidence tended to show that the defendant Len Walton and two others were lying in wait that night for the deceased, Dewey Castleberry, between dark and 9 o'clock p. m., at the cross-roads, the intersection of the Duffie-Red Springs Road and the Newton Road, near which Castleberry was found the next morning. Neighbors near the cross-roads heard three shots that night at the cross-roads or in the direction of the cross-roads, and the defendant Len Walton was identified by witnesses as one of those lying in wait, evidently for the deceased, Dewey Castleberry. After the killing, the defendant Walton made his escape, and was arrested, in March, 1924, at Buffalo, N. Y.

While in the jail at Buffalo, N. Y., the defendant made a statement to the sheriff, which appeared, upon the sheriff's own testimony, to have been voluntary, and was in the nature of a confession. Sheriff Hall testified: "I didn't say anything to him; I didn't ask him any question. He just began talking to me himself. When he began talking, it was in what I would call the lobby of the jail. I didn't ask him anything about it, and nobody else said anything to him or promised him anything or threatened him in any way that caused him to make the statement to me. At the time he made this statement I did not, nor did anybody else in my presence, offer him any reward or any hope of a reward for any statement he might make. I did not, nor did anybody in my presence, threaten him or promise him, or in any way put him in fear, nor hold out any promise to him in any way."

Defendant's exceptions and assignments of error arose out of the following circumstances: After Sheriff Hall had testified as above quoted, defendant's counsel put this question to him: "I ask you, sheriff, if, before any statement was made by Len Walton, he did not state in your presence that he had been cruelly treated and beaten and forced to make a statement to the officers up there that then had him in custody?" To this the State objected. Upon examination, however, by the court, the witness stated that Walton at that time was in his custody, and only one Buffalo officer was present. The court then excluded the answer to the question as put by defendant's counsel, and they excepted. The only ground upon which this statement by the defendant could have been admissible was that it was made at the time that the so-called confession was made. The question assumes that it was made before the confession was made and at the time that the officers had him in custody. It does not appear how long before he made the confession that this statement was made, nor does it appear what the sheriff's answer to the question would have been. He was certainly, in his conversation with the sheriff, not making any statement to the officers at Buffalo, or directing his conversation to them at all.

For these reasons we think the ruling of the court below was correct. Walton's statement to Sheriff Hall was this: "I shot, but the other boys shot, too; and I think you ought to get them. Don't put all the blame on me."

The other exceptions and assignments of error, from the evidence, we do not think material or prejudicial, and cannot be sustained.

From a careful inspection of the record, there was abundant evidence to go to the jury that the defendant, with a motive of revenge, armed, had waited with others at the cross-roads, some time between dark and 9 o'clock, the evening of 14 July, 1923, and killed Dewey Castleberry,

with malice and with premeditation and deliberation. After shooting him, they left him in a terribly wounded condition.

A. Z. McLenden testified, in part, as to the circumstances: "I live in Allendale Township, near this cross-roads they speak of. I live on what they call the Newton Road. That is not the road that leads to Red Springs, but it is one of the cross-roads. I know Jones, who just left the stand, and know where he lives. I saw him on the night of 14 July at my house. My house is 547 yards from the cross-roads. I seen him just a short time after I lay down to go to sleep, which was about a quarter of 9 o'clock. He came there, home, and hollered for me, and it was in the summer-time, and I got up and lay across the bed, with my head in the window, and talked to him out at the road. He told me that he was held up at the cross-roads, and I asked him who held him up, and he said it looked like the fellow that hit the man in the head with a baseball bat out at the fair grounds, and I told him that was Len Walton; and then, while we were talking—while he was out there talking—there come a car by this cross-roads. He said that the man who held him up had a gun, and also he said that this fellow was inquiring from him about a Chalmers car, and he told him he didn't have a Chalmers car, and he told him it was a big car with one light on it; and while we was talking, there come a car along up there and stopped just long enough—it looked like—it might have stopped long enough to speak a few words; and then, after it left, another one came on from towards Red Springs, and it come on up there and made its turn to go in towards Newton's, or down the Newton Road, and it seemed that it might have gone into low gear; and the shooting taken place right there—three pops of the gun. I did not see or hear anything else that night. Jones then went on home, and told me he was intending to go to some colored church. The next morning Jones came to my house, between daylight and sun-up. I hadn't got up, and he called me, and I got up and lay across the foot of the bed, as I did the night before, and talked with him. I got up and put on my clothes, and we walked towards the cross-roads, and we got pretty close by, and I seen for sure that there was a car stopped down there, and I got down a little nearer, and I said to Jones, 'I believe that is Dewey's car'—Dewey Castleberry's. And we went on and got nearer by, where I could see, and Dewey was lying over in the field, and when I got up to the car I walked down from the front of the car, down into the cotton patch, about 10 steps, to where Dewey was lying, and I seen he was alive. The car was something like I would say 75 yards from the cross-roads, at that time, in the edge of the cotton patch. I told Jones to go to Dewey's brother's and tell him, and I would go to Mr. Brown's. It had run a good distance from the way it was at the cross-roads, right into the edge of the

cotton patch—something like about half the distance, probably—that is, the car had left the road and run along in the edge of the cotton patch. All on the radiator and right fender was bloody, and all over the cotton and around was bloody, and where he had lay out there in the field, and there was pieces of windshield all in the seat and all over the hood, and the car was shot from the right-hand side, and—well, it was shot from both sides. There was more evidence of shots in the windshield than anywhere else. There were also shots on the right-hand side, in the side of the car, like, and it was shot-up pretty bad, and it was also shot in the top of the car. We put out then to get a crowd there, you know. Mr. Castleberry was as bloody—well, he was the bloodiest man I ever saw, in the way of—in a condition of that kind, and he was the worst-looking man I ever saw. He was shot in the head. The ground was torn up all around there where he had wallowed all night, it seemed— bloody. The blood stayed there for some six or eight weeks—all on the cotton—after that."

It is true that E. P. Baker, chief of police of Red Springs, said that the morning Castleberry was found he went there about half an hour of sun and found an automatic pistol on the front seat of Castleberry's automobile. It was loaded all the way around—nine balls in it. But he said, on cross-examination: "We saw some shells lying around there, and I picked up two empty shells—shotgun shells, twelve-gauge. I also tracked three tracks. I investigated them very closely. I saw where three men had been sitting out on the edge of the side of the road—all three had sat there on the cotton row. That was right on the edge of the big road—the main road, leading from Red Springs to Duffie's Station—just right at the cross-roads."

These were questions for the jury as to whether the defendant and others were lying in wait to commit a willful, deliberate and premeditated killing.

Castleberry was carried to Fayetteville, to the hospital. J. D. Castleberry, his father, testified as follows: "I live now in Chatham County. On 14 July, 1923, I lived at this same point. Dewey Castleberry was my son. I saw him after the shooting, in the hospital in Fayetteville. He died in Fayetteville, in the hospital, and was buried up in Chatham County, at my old home and his old home. He died the next Friday night after having been shot on Saturday. He lived until Friday night following the shooting on Saturday night. He was buried on Sunday. I saw his wounds. His left eye and temple was all shot-up."

The court below gave a careful, painstaking and accurate charge. We have examined carefully the numerous exceptions and assignments of error, and, from an examination of the entire record, we can find no prejudicial or reversible error.

No error.